**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE**

| | | |
|---|---|---|
| **BILLY JOE BROWN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. _____** |
| | ) | **JURY TRIAL DEMANDED** |
| **INFRA PIPE SOLUTIONS U.S.A., LLC** | ) | |
| **f/k/a** | ) | |
| **ENDOT INDUSTRIES, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## COMPLAINT

COMES NOW Plaintiff, Billy Joe Brown ("Mr. Brown"), through undersigned counsel and for his Complaint against Infra Pipe Solutions U.S.A., LLC, formerly known as Endot Industries, Inc., states as follows:

## NATURE OF THE CASE

1. This is an action brought pursuant to the Americans with Disabilities Act of 1990 ("ADA"), as amended, 42 U.S.C. § 12101 *et seq*.; the Age Discrimination in Employment Act, 29 U.S.C. § 621, *et seq*.; Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq*.; the Tennessee Human Rights Act, Tenn. Code Ann. § 4-21-101 *et seq*.; the Tennessee Public Protection Act, Tenn. Code Ann. § 50-1-304; and the Tennessee Disability Act, Tenn. Code Ann. § 8-50-103; to remedy acts of disability discrimination, age discrimination, and retaliation for engaging in protected activity committed by Infra Pipe Solutions U.S.A., LLC d/b/a Infra Pipes, formerly Infra Pipe Solutions, Ltd. d/b/a Endot Industries, Inc. ("IPS" or the "Company") against Mr. Brown.

2.	Mr. Brown was an employee of IPS and experienced discrimination based on his disability and his age.

3.	The discrimination included supervisors ignoring his accommodations, interfering with his right to reasonable accommodations for his disabilities, and otherwise discriminating against him because of his disabilities.

4.	Mr. Brown further experienced age discrimination in violation of federal and state law.

5.	Mr. Brown experienced retaliation due to reporting IPS conduct in violation of safety regulations, such as 29 U.S.C. § 654(a)(1), 29 C.F.R. § 1910.132, and 29 C.F.R. § 1910.157. He also experienced retaliation for reporting conduct that he believed in good faith constituted unlawful sexual harassment, and retaliation for exercising his rights under the ADA.

6.	The retaliation included termination after he refused to participate in or stay silent about illegal activity.

**JURISDICTION AND VENUE**

7.	This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, as this is a civil action arising under the laws of the United States, specifically Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.*, and the Age Discrimination in Employment Act, 29 U.S.C. § 621, *et seq.*

8.	This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

9.	Venue is proper in this judicial district as all the events giving rise to Mr. Brown's claims occurred in this district.

2

10.     Mr. Brown exhausted his administrative remedies under Title VII, the ADA, and the ADEA by timely filing a Charge of Discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC") against IPS. The EEOC issued Mr. Brown a Notice of Right to Sue on July 8, 2026. The Notice of Right to Sue is attached hereto as Exhibit 1.

11.     This Complaint is timely filed within 90 days of the EEOC Notice of Right to Sue.

## PARTIES

12.     Mr. Brown is an adult citizen of Tennessee and resides in Greeneville, Tennessee.

13.     Defendant IPS is a limited liability company engaged in the business of manufacturing polyethylene pipeline solutions. The defendant operates a facility in Greeneville, Tennessee, where Mr. Brown was employed.

14.     At all relevant times, IPS was an employer as defined by Title VII, the ADA, and the ADEA, employing more than twenty (20) employees/agents. IPS was also an employer as defined by the Tennessee Human Rights Act and Tennessee Disability Act, employing more than eight (8) employees/agents. Additionally, IPS was a private employer, thus meeting the definition of employer under the Tennessee Public Protection Act.

15.     At all relevant times, Mr. Brown was an employee as defined by Title VII, the ADA, the ADEA, the THRA, the Tennessee Disability Act, and the Tennessee Public Protection Act.

16.     At all relevant times, Mr. Brown was over the age of 40 and was a qualified individual with a disability.

## FACTUAL ALLEGATIONS

17.     Mr. Brown was employed by IPS from March 2024 until July 2025.

3

18. At the time Mr. Brown was hired, he was 59 years of age.

19. Mr. Brown was hired as a maintenance technician at the Greeneville, Tennessee plant.

20. While on duty, Mr. Brown witnessed Plant Manager LaTonia Smith ("Smith") wearing inappropriate and revealing clothing, appearing to be intoxicated at work, and directing subordinates to perform personal chores for her on company time.

21. Smith also made unwanted, sexually suggestive comments to Mr. Brown and other employees. For example, on one occasion, she suggested to Mr. Brown that he had been looking at her "big, juicy ass."

22. Smith allegedly had a sexual relationship with a subordinate maintenance employee and treated that employee favorably because of the sexual relationship

23. Mr. Brown reported Smith's conduct, which he in good faith believed to be unlawful sexual harassment, to his supervisor Paul Stanley ("Stanley"), Arron Landers ("Landers") in the Human Resources department, and the New Jersey Corporate office.

24. IPS took no action to correct Smith's behavior.

25. Smith expressed to others an intent to fire Mr. Brown after his reports about her behavior.

26. Mr. Brown communicated medical restrictions/accommodations requests to Stanley related to a disability involving his knee.

27. Although the requested accommodations were formally granted, Smith and Stanley interfered with Mr. Brown's right to reasonable accommodations by ordering him to perform tasks such as installing heavy overhead pipes.

4

28.    On October 31, 2024, Mr. Brown went on approved medical leave to have knee replacement surgery.

29.    On March 31, 2025, Mr. Brown's physician cleared him to return to work with the restrictions of no ladders; no kneeling, bending, or stooping; and lifting limitations.

30.    Stanley told Brown in front of another employee not to let his doctor state that he would need restrictions/accommodations for longer than six months because if he did, the company would "cut its losses" and "let [him] go." While Mr. Brown was on medical leave. Stanley made a similar statement to coworker Jeff Leake.

31.    Mr. Brown's physician indicated to Mr. Brown on May 7, 2025, that these restrictions may be permanent.

32.    Fearing for his job, Mr. Brown asked his doctor to limit the restrictions to six months.

33.    Mr. Brown's underlying medical condition and post-surgical condition both substantially limited one or more major life activities, including lifting, bending, kneeling, and stooping. Mr. Brown's knee condition therefore constitutes a disability under the ADA.

34.    Human Resources approved Mr. Brown's return to work with restrictions and the assistance of another employee when Mr. Brown's physician cleared him to return. In other words, Human Resources, on paper, granted Mr. Brown reasonable accommodations for his disabilities.

35.    However, on April 4, 2025, Stanley asked Mr. Brown to build reels that required him to stoop to grab them. This caused Mr. Brown to hurt himself.  Mr. Brown had an accommodation of no stooping, and Stanley denied and interfered with Mr. Brown's accommodation.

5

36. On July 2, 2025, while working night shift, Mr. Brown noticed smoke near a grinder at the Greeneville plant. He promptly notified Stanley and Production manager Duane Wilburn.

37. The standard procedure when a unit was clogged included removing the clogged item and burning it in the open-air parking lot.

38. Mr. Brown completed this procedure twice in the two weeks before July 2.

39. Earlier on July 2, during the day shift, the maintenance manager had apparently allowed the burning to be done indoors while the grinder was mounted, with the vented pipe not disconnected.

40. Mr. Brown had not been trained to fight fires by the Company, so he monitored the fire as he had been trained to do at other industrial worksites and in previous industrial maintenance training courses. He attempted to contact Willburn and he also called Stanley.

41. Brown asked Stanley if he should call the fire department, but Stanley told him not to call the fire department.

42. Stanley instructed Mr. Brown to use a water-based fire extinguisher to suppress the fire. Mr. Brown was concerned that using water on the burning plastic or equipment could worsen the hazard. He tested this thought by squirting water from a water bottle onto the fire, and the water caused the fire to flare up, confirming his suspicion that water was not safe to use on a plastic fire.

43. Mr. Brown attempted to fight the fire with a dry chemical-based fire extinguisher.

44. Wilburn eventually arrived after the fire had grown, and after Mr. Brown had already used at least one full fire extinguisher. Wilburn and Mr. Brown were able to extinguish the fire with three fire extinguishers.

45. Brown notified Stanley by text message that the fire had been extinguished.

46. When Stanley eventually arrived, he appeared stressed. Stanley stated that "someone" would "be held accountable."

47. Mr. Brown expressed concern that the fire resulted from unsafe practices allowed by Stanley, such as attempting to melt clogged plastic inside while the grinder was mounted, a lack of personal protective equipment, no "fire watch" being assigned to prevent the ignition of combustible materials and mitigate any escalating risks, and the lack of training as to how to fight a fire at the facility.

48. Some of these practices violated OSHA regulations, including but not limited to 29 U.S.C. § 654(a)(1), 29 C.F.R. § 1910.132, 29 C.F.R. § 1910.157, and 29 C.F.R. § 1910.38, 29 C.F.R. § 1910.39.

49. Mr. Brown had previously spoken up about unsafe practices in the workplace. When he raised safety issues, Stanley reacted angrily.

50. Mr. Brown had contacted the U.S. Department of Labor to report safety violations by IPS. He had copied down the Department of Labor's phone number from a poster in the break room at the facility. While he was obtaining the Department of Labor's phone number, a person whom Mr. Brown believes is a day shift supervisor came into the room and asked him, "What are you doing? Calling OSHA?"

51. Mr. Brown sent a message to the Department of Labor through its website on or shortly before July 11, 2025.

52. On July 14, 2025, IPS terminated Mr. Brown's employment.

7

53.     The termination documents[1] referred to the fire on July 2 and falsely accused Mr. Brown of failing to act to put out the fire.

54.     Additionally, the boxes checked for reasons for termination were "Substandard performance" and "Repeated Violation of Safety Policies."

55.     Mr. Brown had never been counseled, written up, or otherwise disciplined for safety or performance issues.

56.     Mr. Brown had done what he had been trained to do prior to working at the Company: conduct a "fire watch" until someone who could safely extinguish the fire arrived to do so. Moreover, he asked when he should call the fire department and was told not to do so, and he used a fire extinguisher to attempt to extinguish the fire.

57.     At the time of termination, Mr. Brown was 60 years old.

58.     No employee who is younger than Mr. Brown or who is not disabled or who had not engaged in protected activity had been disciplined for similar conduct.

59.     The stated reason for Mr. Brown's termination was pretextual. Stanley and Smith had already decided to terminate Mr. Brown prior to the fire incident. The real reason or reasons for the termination were discrimination on the basis of disability and age and/or retaliation for protected activity under the ADA (requesting and using accommodations), Title VII (reporting sexual harassment by a supervisor), and the Tennessee Public Protection Act (refusing to participate in or stay silent about violations of law).

60.     In addition to voicing concerns about the safety issues mentioned above, before his termination, Mr. Brown raised concerns to Stanley about IPS's lack of accessible lockout/tagout equipment for maintenance work.

---

[1] The termination documents referred to Brown as "Billy Joe Smith."

61. When Stanley took Mr. Brown and another employee to the lockout/tagout center, the center contained only one lock and was itself locked. Stanley and the employees did not have access to the key, and Stanley ultimately used a tool to force the lockout/tagout center open so employees could access lockout/tagout equipment.

62. Because IPS did not provide adequate or accessible lockout/tagout equipment, Mr. Brown had to use his own personal lock for maintenance work in the Rail Pump House.

63. On July 2, 2025, when the grinder fire developed, Mr. Brown promptly sought management assistance rather than attempting to fight an industrial plastic fire without proper training, PPE, or equipment.

64. At approximately 6:47 p.m., he texted Production Manager Duane Wilburn, "911 you need to call me."

65. After the fire was brought under control, he updated Stanley that "Every thing is under control as now" and that cleanup had begun.

66. The grinder had recurring clogging problems before and after the July 2 fire.

67. On July 1, 2025, the grinder became stuck again after an improper screen installation.

68. Earlier on July 2, 2025, another employee had been burning or melting plastic from the grinder inside the building when the fire occurred.

69. The grinder issue continued after the fire, and employees continued cleaning the grinder with tools such as pry bars and chisels.

70. Mr. Brown refused to fight an industrial plastic fire without appropriate training, PPE, and equipment, and he refused to remain silent about the unsafe practices that caused or contributed to the fire, including indoor burning of plastic, lack of accessible fire-safety

9

equipment, lack of PPE, lack of fire-fighting training, lack of proper fire watch procedures, and other unsafe maintenance practices involving lockout/tagout equipment.

71.     In the alternative to his discrimination and retaliation claims, Mr. Brown alleges that IPS terminated him because he refused to participate in and/or remain silent about illegal workplace-safety practices.

**COUNT I:**
AMERICANS WITH DISABILITIES ACT, 42 U.S.C. 12101, ET SEQ.
DISCRIMINATION, FAILURE TO ACCOMMODATE, AND INTERFERENCE

72.     Mr. Brown hereby incorporates by refence the previous paragraphs of this Complaint as if realleged fully herein.

73.     Mr. Brown had a disability affecting his knee, followed by knee replacement surgery. The original condition and his post-surgical condition both substantially limited one or more major life activities, including climbing, kneeling, bending, stooping, and lifting. Mr. Brown's knee condition therefore constitutes a disability under the ADA.

74.     IPS also regarded Mr. Brown as disabled or impaired because of his knee condition, surgery, work restrictions, and need for accommodations.

75.     At all relevant times, Mr. Brown was qualified to perform the essential functions of his maintenance technician position with or without reasonable accommodations.

76.     When Mr. Brown was offered employment, he disclosed his knee condition and related physical restrictions to Stanley.

77.     Stanley told Mr. Brown that IPS would work with his restrictions and that Mr. Brown should do what he could safely do.

78.     Mr. Brown requested, and Human Resources approved, reasonable accommodations for Mr. Brown both before and after his knee replacement surgery.

10

79. The Company's own approval of the restrictions and assistance demonstrates that the accommodations were reasonable and did not impose an undue hardship.

80. After Smith began targeting Mr. Brown, Stanley's approach to Mr. Brown's restrictions changed. Stanley went from telling Mr. Brown to work within his restrictions to pressuring him to "figure it out" and warning him to stay out of Smith's "crosshairs."

81. Smith and Stanley knowingly pressured Mr. Brown to perform work outside his medical restrictions, including tasks that required bending, stooping, lifting, and working alone on heavy overhead pipe, despite knowing those tasks were inconsistent with his restrictions.

82. On April 4, 2025, Stanley assigned Mr. Brown to build reels requiring stooping, despite his no-stooping restriction. Mr. Brown hurt himself performing the assignment.

83. Mr. Brown's physician indicated on May 7, 2025, that his restrictions should be permanent.

84. Mr. Brown requested that the restrictions be limited to six months because he feared Smith and Stanley would use permanent restrictions as a basis to terminate him.

85. Stanley told other employees that IPS would "cut its losses" and fire Mr. Brown when he returned to work with restrictions.

86. Another employee heard Stanley state that IPS could not fire Mr. Brown before his surgery because doing so would be illegal and that IPS would have to wait to avoid getting in trouble.

87. Smith and Stanley undermined Mr. Brown's granted accommodations in practice by assigning work inconsistent with his restrictions, thereby interfering with Mr. Brown's reasonable accommodations.

11

88.     Four months after Mr. Brown returned to work from his knee surgery, and while he still needed and was using reasonable accommodations, he was terminated.

89.     By its actions, policies, and practices, IPS discriminated against Mr. Brown on the basis of his disability, in violation of the ADA.

90.     The Company's failure to abide by reasonable accommodations for Mr. Brown's known disability constitutes interference and a discriminatory practice under the ADA.

91.     As a direct and proximate result of the Company's unlawful conduct, Mr. Brown has suffered and continues to suffer damages, including but not limited to lost wages and benefits, humiliation, embarrassment, loss of dignity, and emotional distress.

92.     The Company's actions were committed with reckless disregard for Mr. Brown's federally protected rights, entitling him to punitive damages.

**COUNT II:**
<u>AMERICANS WITH DISABILITIES ACT, 42 U.S.C. 12101, ET SEQ.</u>
<u>RETALIATION</u>

93.     Mr. Brown hereby incorporates by refence the previous paragraphs of this Complaint as if realleged fully herein.

94.     Mr. Brown engaged in protected activity under the ADA by requesting reasonable accommodations for his disability.

95.     In response, IPS engaged in retaliation by terminating his employment within four months of his return from medical leave and request for accommodations.

96.     The close proximity between his protected activities and his termination shows that his termination was causally related to his protected activity. Mr. Brown's termination occurred a little over a month after his doctor indicated that he would need permanent accommodations.

12

97.     IPS's stated reason for terminating Mr. Brown is pretextual and baseless.

98.     As a direct and proximate result of the Company's unlawful conduct, Mr. Brown has suffered and continues to suffer damages, including but not limited to lost wages and benefits, humiliation, embarrassment, loss of dignity, and emotional distress.

99.     IPS's actions were committed with malice or with reckless disregard for Mr. Brown's federally protected rights, entitling him to punitive damages.

**COUNT III:**
AGE DISCRIMINATION IN EMPLOYMENT ACT - 29 U.S.C. § 621, ET SEQ.
DISCRIMINATION

100.    Mr. Brown hereby incorporates by refence the previous paragraphs of this Complaint as if realleged fully herein.

101.    At all relevant times herein, Mr. Brown was over the age of 40.

102.    ADEA provides that it is unlawful for an employer to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such an individual's age. 29 U.S.C. § 623 (a)(1).

103.    In violation of ADEA, IPS willfully discriminated against Mr. Brown on the basis of age by firing Mr. Brown under circumstances for which no similarly situated employee of younger age had been fired.

104.    As a direct and proximate result of IPS's unlawful conduct, Mr. Brown has suffered and continues to suffer damages, including but not limited to lost wages and benefits, humiliation, embarrassment, loss of dignity, and emotional distress.

13

**COUNT IV:**
TENNESSEE HUMAN RIGHTS ACT - TENN. CODE ANN. §4-21-101, ET SEQ.
AGE DISCRIMINATION

105. Mr. Brown hereby incorporates by refence the previous paragraphs of this Complaint as if realleged fully herein.

106. THRA provides that an employer may not discharge or otherwise discriminate against an individual on the basis of the individual's age. Tenn. Code Ann. § 4-21-401 (a)(1).

107. In violation of THRA, IPS willfully discriminated against Mr. Brown on the basis of age by terminating him under circumstances that younger employees had not been terminated.

108. As a direct and proximate result of the Company's unlawful conduct, Mr. Brown has suffered and continues to suffer damages, including but not limited to lost wages and benefits, humiliation, embarrassment, loss of dignity, and emotional distress.

**COUNT V:**
TENNESSEE HUMAN RIGHTS ACT - TENN. CODE ANN. §4-21-101, ET SEQ.
RETALIATION

109. Mr. Brown hereby incorporates by reference the previous paragraphs of this Complaint as if realleged fully herein

110. THRA provides that it is unlawful for an employer to discriminate against an employee who opposes any practice made unlawful under the THRA. Tenn. Code Ann. § 4-21-301(a)(1).

111. Mr. Brown engaged in protected activity under the THRA by reporting conduct he reasonably and in good faith believed constituted sexual harassment and sex-based workplace misconduct.

112. In violation of THRA, IPS willfully retaliated against Mr. Brown when it terminated Mr. Brown's employment on July 14, 2025, as a result of Mr. Brown's protected complaint of sexual harassment.

14

113. Although Mr. Brown's termination ultimately occurred a number of months after his protected report, Smith and Stanley had previously stated their intent to terminate Mr. Brown. These comments were made not long after he reported sexual harassment.

114. As a direct and proximate result of IPS's unlawful conduct, Mr. Brown has suffered and continues to suffer damages, including but not limited to lost wages and benefits, humiliation, embarrassment, loss of dignity, and emotional distress.

**COUNT VI:**
**TENNESSEE PUBLIC PROTECTION ACT - TENN. CODE ANN. § 50-1-304, ET SEQ.**

115. Mr. Brown hereby incorporates by refence the previous paragraphs of this Complaint as if realleged fully herein.

116. In the alternative to his discrimination and retaliation claims, Mr. Brown alleges that IPS terminated him solely because he refused to participate in and/or remain silent about illegal activities involving unsafe fire, PPE, training, and workplace-safety practices.

117. Before his termination, Mr. Brown raised concerns to Stanley about IPS's lack of accessible lockout/tagout equipment for maintenance work.

118. When Stanley took Mr. Brown and another employee to the lockout/tagout center, the center contained only one lock and was itself locked. Stanley and the employees did not have access to the key, and Stanley ultimately used a tool to force the lockout/tagout center open so employees could access the equipment needed to lock out machinery.

119. Because IPS did not provide adequate or accessible lockout/tagout equipment, Mr. Brown had to use his own personal lock for maintenance work in the Rail Pump House.

120. Mr. Brown refused to act as an untrained firefighter and refused to fight an industrial plastic fire without appropriate training, equipment, or personal protective equipment.

15

121. Mr. Brown reasonably believed IPS was requiring him to perform maintenance and fire-related tasks under unsafe conditions, including tasks involving energized or improperly secured equipment and fire risks, without adequate training, PPE, or lockout/tagout protection.

122. At approximately 6:47 p.m. on July 2, 2025, Mr. Brown texted Production Manager Duane Wilburn, "911 you need to call me," reflecting the seriousness of the fire and Mr. Brown's effort to obtain assistance from management rather than recklessly attempting to fight an industrial fire without proper training or PPE.

123. After the fire was brought under control, Mr. Brown promptly updated Stanley that "Every thing is under control as now" and that cleanup had begun.

124. The grinder had recurring clogging problems before and after the July 2 fire.

125. On July 1, 2025, the grinder became stuck again after an improper screen installation.

126. Earlier on July 2, 2025, another employee was burning or melting plastic from the grinder inside the building when the fire occurred.

127. The grinder issue continued after the fire, and employees continued cleaning the grinder with tools such as pry bars and chisels.

128. Mr. Brown used the company phone to contact the Department of Labor about unsafe conditions and management conduct.

129. Stanley was aware that Mr. Brown was considering taking action regarding unsafe conditions and management conduct.

130. TPPA prohibits an employer from discharging or terminating an employee solely for refusing to participate in or remain silent about illegal activities.

16

131. Mr. Brown engaged in protected activity under the TPPA by informing his supervisor about conduct by IPS that violated OSHA regulations intended to protect the public safety, or welfare.

132. The OSHA regulations violated include 29 U.S.C. § 654(a)(1), 29 C.F.R. § 1910.132, 29 C.F.R. § 1910.157, and 29 C.F.R. § 1910.147.

133. The conduct included burning plastic inside the building without proper monitoring, PPE, fire extinguishers, and training.

134. The Company's violation of these regulations amounts to illegal activity under TPPA.

135. Mr. Brown refused to participate in the illegal activity by completing a "fire watch" and calling for aid when he did not have proper equipment or training.

136. IPS subjected Mr. Brown to adverse employment actions by terminating his employment.

137. IPS's stated reason for termination was pretextual, and IPS terminated Mr. Brown solely because he refused to participate in and/or remain silent about the illegal safety practices described above.

138. The Company violated Tenn. Code Ann. § 50-1-304.

139. As a direct and proximate result of IPS's unlawful conduct, Mr. Brown has suffered and continues to suffer damages, including but not limited to lost wages and benefits, humiliation, embarrassment, loss of dignity, and emotional distress.

17

**COUNT VII:**

TENNESSEE DISABILITY ACT - TENN. CODE ANN. § 8-50-103
DISCRIMINATION

140.     Mr. Brown hereby incorporates by refence the previous paragraphs of this Complaint as if realleged fully herein.

141.     In violation of the TDA, IPS willfully discriminated against Mr. Brown on the basis of his disability by terminating him because of his disability.

142.     Mr. Brown's disability did not prevent him from performing his duties.

143.     As a direct and proximate result of the Company's unlawful conduct, Mr. Brown has suffered and continues to suffer damages, including but not limited to lost wages and benefits, humiliation, embarrassment, loss of dignity, and emotional distress.

**COUNT VIII:**

TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, 42 U.S.C. § 2000E, ET SEQ.
RETALIATION

144.     Mr. Brown hereby incorporates by reference the preceding paragraphs of this Complaint as if fully realleged herein.

145.     Title VII prohibits an employer from retaliating against an employee because the employee opposed a practice made unlawful by Title VII.

146.     Mr. Brown engaged in protected activity under Title VII when he complained about and opposed conduct he reasonably and in good faith believed constituted sexual harassment and sex-based workplace misconduct by Plant Manager Latonia Smith.

147.     Specifically, Mr. Brown reported Smith's sexually charged conduct to his supervisor Paul Stanley, to Arron Landers in Human Resources, and to IPS's New Jersey corporate office.

18

148. IPS knew of Mr. Brown's protected activity through Mr. Brown's reports to Stanley, Human Resources, and the corporate office.

149. After Mr. Brown engaged in protected activity, Smith expressed an intent to have Mr. Brown fired. Smith and Stanley thereafter stated or acted on their intent to terminate Mr. Brown's employment.

150. On July 14, 2025, IPS terminated Mr. Brown's employment.

151. IPS's stated reasons for terminating Mr. Brown — including alleged substandard performance and repeated violation of safety policies — were false, baseless, and pretextual.

152. IPS terminated Mr. Brown because he opposed and reported conduct he reasonably and in good faith believed constituted sexual harassment and sex-based workplace misconduct, in violation of Title VII.

153. As a direct and proximate result of IPS's unlawful retaliation, Mr. Brown has suffered and continues to suffer damages, including but not limited to lost wages and benefits, humiliation, embarrassment, loss of dignity, emotional distress, and other compensable losses.

154. IPS's actions were committed with malice or reckless disregard for Mr. Brown's federally protected rights, entitling Mr. Brown to punitive damages, together with attorney's fees, costs, interest, and all other relief available under Title VII.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Billy Joe Brown prays for judgment against Defendant Infra Pipe Solutions USA, LLC for payment of back wages and benefits, reinstatement or front pay in lieu of reinstatement, compensatory, actual, liquidated and/or punitive damages, together with prejudgment interest from the date of his termination from employment, and for costs and attorney's fees, and for such other relief as may be just and equitable.

19

BILLY JOE BROWN

By Counsel

/s/ Alexis I. Tahinci
Alexis I. Tahinci (BPR #031808)
Tahinci Law Firm PLLC
105 Ford Ave, Suite 3
Kingsport, TN 37663
Ph: (423) 406-1151
F: (423) 815-1728
alexis@tahincilaw.com
*Counsel for Plaintiff*